UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

GREGORY BENTON,

    Plaintiff,             Case No. 3:13-CV-00613-YY

 v.                   OPINION AND ORDER

LEGACY HEALTH and CHRISTOPHER
MCDONALD,

    Defendants.

YOU, Magistrate Judge:

  Defendant Portland Police Officer Christopher McDonald ("McDonald") moves for summary judgment (ECF #126) against plaintiff Gregory Benton's ("Benton") second claim for relief, a 42 U.S.C. § 1983 claim in which Benton contends that McDonald used excessive force. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). ECF #138. For the reasons that follow, McDonald's motion for summary judgment is GRANTED.

## I.  Summary Judgment Standard

  A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When judging the evidence at the summary judgment stage, the district court is not to make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Id*. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## II.     Excessive Force Claim

McDonald contends that Benton has failed to establish a claim of excessive force under the Fourth Amendment, specifically that he has failed to establish, as a matter of law, that McDonald's actions were objectively unreasonable.

### A.     Law Regarding Excessive Force

Under the Fourth Amendment, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful

balancing of ''the nature and quality of the intrusion on the individual's Fourth Amendment interests'' against the countervailing governmental interests at stake." *Id.* at 396. "Stated another way, [the court] must 'balance the amount of force applied against the need for that force." *Bryan v. MacPherson*, 630 F.3d 805, 823–24 (9th Cir. 2010) (quoting *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir.2003)).

"[P]roper application" of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Of those three factors, the "most important single element" is whether the suspect posed an immediate threat to the safety of the officers or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

These three factors are not exclusive. *Bryan*, 630 F.3d at 826. Rather, the court examines the totality of the circumstances and considers "whatever specific factors may be appropriate in a particular case[.]" *Franklin v. Foxworth,* 31 F.3d 873, 876 (9th Cir. 1994). Other factors the court considers include the availability of alternative methods of capturing or detaining the suspect and the plaintiff's mental and emotional state. *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010)). If "it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2003). However, officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct [the court] identif[ies] as

reasonable." *Glenn v. Washington Cty.*, 673 F.3d 864, 876 (9th Cir. 2011)(quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Courts must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Id.* at 396 (quoting *Johnson v. Glick*, 481 F.2d, at 1033).

"Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir.2012) (internal quotations and citations omitted); *see also Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)("police misconduct cases almost always turn on a jury's credibility determinations"). "But, even though reasonableness traditionally is a question of fact for the jury, . . . defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott*, 39 F.3d at 915 (citations omitted).

**B.     Background Facts**

Here, the undisputed evidence shows that on August 5, 2012, at approximately 2 am, McDonald was dispatched to Legacy Emanuel Hospital in response to a call regarding an unwanted person who was handcuffed by hospital security officers. Joint Statement of

Undisputed Facts ("Joint Statement")(ECF #135), ¶¶ 2, 9, 17.  When McDonald arrived at the hospital, Benton was in handcuffs and either sitting or standing.  *Id.*, ¶ 18.  McDonald spoke with the Legacy security officers ("LSO"), Christopher Gordon ("Gordon") and Dave Davies ("Davies"), and one of them told McDonald that Benton was unwanted, had become combative with them, and started kicking them.  *Id.*, ¶ 20.  The LSOs further told McDonald that Benton had just been released as a patient from the hospital.  *Id.*, ¶ 22.

McDonald spoke with the LSOs for 30 to 45 seconds, and before their conversation was finished, Benton stood up and took two or three steps away from the officers.  *Id.*, ¶ 21, 23.  McDonald did not know if he had evidence of criminal charges at that point.  However, he felt there was a threat of Benton escaping because he was starting to walk away, so he thought he needed to get over to Benton and try to get him to sit back down.  *Id.* at ¶ 24.  McDonald shoved Benton with two hands but was unsuccessful in getting him to the ground.  *Id.* at ¶ 25.  Thereafter, McDonald grabbed one of Benton's arms with both of his hands and put him to the ground.  *Id.* at ¶ 25.  Benton's shoulder and side of his head made contact with the pavement.  *Id.* at ¶ 26.  Benton had a lot of hair at the time of the incident.  *Id.* at ¶ 27.

McDonald did not attempt to talk to Benton before shoving him or taking him to the ground, nor did he otherwise try to de-escalate the situation before using physical force.  *Id.* at ¶¶ 38, 39.  Benton was not physically aggressive towards McDonald at any point during the incident.  *Id.* at ¶ 40.  McDonald did not give Benton any directions or orders, and Benton did not refuse to comply with any directions or orders from McDonald.  *Id.* at ¶ 41.  Benton also did not refuse to comply with any directions or orders from the LSOs while McDonald was present.  *Id.* at ¶ 42.

After being put to the ground, Benton began complaining about a traumatic brain injury he had previously suffered at some point in this life. *Id.*, ¶ 28. Because Benton continued to complain about his brain injury, McDonald called for medical assistance. *Id.* McDonald did not observe that Benton was bleeding or see other evidence of injury after Benton was put on the ground. *Id.* at ¶ 29. Gordon also did not see an injury to Benton's head after he was taken to the ground by McDonald. *Id.* at ¶ 30.

At his deposition, Benton testified: "did [Officer McDonald] hit me, no. I just fell to the ground. I think he was shocked that I hit the ground." *Id.* at ¶ 31. Benton further clarified that the abrasions and contusions he received on the front of his head that night were all the result of previous actions by the LSOs, and that none of those injuries were caused by McDonald. *Id.* at ¶¶ 32, 37.

Benton was immediately examined by American Medical Response paramedic Thomas Koehler ("Koehler") who saw no evidence of trauma, and concluded that Benton had no significant or obvious injury to his head. *Id.* at 33-34. Koehler did not see any redness, swelling, blood, lacerations, abrasions, or any other evidence of injury to Benton's head. *Id.* at ¶ 35. He concluded that Benton's complaints were a behavioral/psychological issue, and that Benton had no injuries. *Id.* at ¶ 36.

McDonald did not believe he had probable cause to charge plaintiff with any crime, and he did not charge plaintiff. *Id.* at ¶ 42. He believed Benton had mental health problems, which he noted in his report. *Id.* at ¶ 43.

The parties offered additional evidence in the form of the following deposition testimony:

Benton testified that McDonald reached for him by the arm or shoulder on the right side, and next thing he knew, he was on the ground, i.e., the driveway. Declaration of Robert

Yamachika ("Yamachika Decl.")(ECF #127), Ex. 1, at 12-13. According to Benton, McDonald seemed shocked that he had hit the ground and afterwards said something like, "Oh, my God, I did not see he had tubes," referring to drainage tubes from Benton's previous surgery. *Id.* at 9; Ex., 2, at 8. Benton testified that he was in hospital scrubs and hospital type footwear at the time.[1] *Id.*, Ex. 1, at 7.

Benton claims he sustained a "simple bump" on his head—on the same side as a previous skull fracture and traumatic brain injury—under his hair. *Id.*, Ex.1, at 11, 15, 17, 19. Although he claims that McDonald was not responsible for the injuries to the front of his head, which he contends were previously caused by the Legacy security officers, he contends that the "fall and striking of his head on the pavement" was one of "four strikes" to the head he received that day and contributed to the increase in traumatic brain injury symptoms he sustained for the following six months. *Id.* at 11, 18-19.

McDonald recalls that when he arrived at the scene, Benton was having a "temper tantrum," "kicking and writhing," and alternatively sitting and lying down. *Id.*, Ex. 4, at 2; Joint Statement, Ex. 4, at 22. The LSOs were within two feet from Benton, ready to "put a hand on him if they needed to." Yamachika Decl., Ex., 4, at 3. While speaking with McDonald, the LSOs walked over to McDonald and left Benton unattended. *Id.* at 5. No one else was around. *Id.*

McDonald claims he was not informed about anything concerning Benton's mental health during his conversation with the LSOs. *Id.*, Ex. 4, at 5-6. According to McDonald, Benton was "still highly agitated," verbally abusive to the LSOs, and using lots expletives. *Id.* at 6-8. When Benton stood up and began walking away, McDonald knew that Benton had

---

[1] At the hearing, the parties explained this fact is in dispute.

7 – OPINION AND ORDER

attempted to harm the LSOs and believed there was a threat of him possibly escaping. *Id*. at 7. McDonald had a lot of interactions with people in handcuffs who had been combative, and he had even been headbutted by someone in handcuffs. *Id.* at 10-11. McDonald believed he needed to get over to Benton and try to get him to sit back down. *Id.* at 7. Because Benton had been combative with the LSOs and appeared to be trying to get away, McDonald believed the "time for talking with him had passed at that point." Declaration of Danielle Hunsaker ("Hunsaker Decl.")(ECF #137), Ex. 2, at 9.

McDonald initially attempted to shove Benton into a grassy planter strip. Yamachika Decl., Ex. 4, at 8-9. However, Benton was able to maintain his balance, so McDonald grabbed one of his arms and took him to the ground. *Id.* at 9. McDonald claims he did not pick Benton up and toss him, or drag him face first to the ground, or throw him down and land on him. *Id.*

Gordon recalls that Benton "just jumped up and tried to take off running" toward the hospital, i.e., the emergency department. *Id.*, Ex. 2, at 6. Davies recalls that Benton stood up and started to take a step away when Officer McDonald said, "Whoa, come back here," and grabbed the edge of Benton's clothing. *Id.*, Ex. 3, at 5. Benton then tripped and kind of fell down—"ankle, knee, elbow, hip, shoulder"—in what was not a "big crash." *Id.* at 6.

**C.  Analysis**

As discussed above, the court balances the amount of force applied against the need for that force. *Bryan*, 630 F.3d at 823–24. Here, the amount of force that McDonald applied was minimal. The undisputed facts are that McDonald tried to shove Benton to the ground with both hands, but was unsuccessful. He then grabbed one of Benton's arms and took him to the ground. Benton claims he suffered a bump on the side of his head as a result.

In examining the need for force, the court considers the severity of the crime, which in this case was minor: Benton was cited by the LSOs for trespass, a Class C misdemeanor under Oregon law. With respect to whether Benton posed an immediate threat to the officers or others, McDonald concedes that Benton likely did not pose such a threat as he was already in handcuffs. However, the uncontroverted evidence is that McDonald knew that Benton was "unwanted," combative, and had kicked at the LSOs, and Benton stood up and walked two to three steps away in what McDonald perceived was an attempt to flee. Even viewing the evidence in the light most favorable to Benton, the minimal amount of force that McDonald used to restrain him from fleeing was objectively reasonable under the circumstances. Courts have consistently held that such a *de minimis* use of force is insufficient to support a claim of excessive force. *See Parker v. City of Los Angeles et al*, No. 215CV04670SVWJEM, 2016 WL 9153765, at *7 (C.D. Cal. June 22, 2016)("a *de minimis* use of force is insufficient to support a claim of excessive force")(citing *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001) (finding no constitutional violation where an officer pushed the plaintiff to the ground to handcuff her and fractured her finger in the process); *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011)("A *de minimis* use of force is insufficient to support a claim."); *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002)(recognizing that "the typical arrest involves some force and injury"); *Fidge v. Lake County Sheriff's Dept.*, 2015 WL 3919819, at *9 (N.D. Cal. June 25, 2015)("Neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive force.")).

Benton claims that McDonald's actions were excessive in light of the fact he was recently released from the hospital, still clothed in hospital scrubs and hospital type footwear, and handcuffed. While the parties dispute whether Benton was wearing scrubs and slippers, it is undisputed that the LSOs told McDonald that Benton had just been released from the hospital.

However, as McDonald's counsel argued at the hearing, hospitals sometimes must discharge disruptive patients from their property. Thus, even assuming that McDonald knew Benton was a hospital patient, his split-second decision in this case, made after being on the scene for only 30 to 45 seconds, was objectively reasonable under all of the circumstances.

Benton also contends that McDonald's actions were unreasonable because McDonald made no attempt, in light of Benton's mental health issues, to de-escalate the situation by giving verbal warnings. The absence of a warning is a factor that the court considers in determining excessive force. *Deorle*, 272 F.3d at 1284. "Appropriate warnings comport with actual police practice." *Id.* However, the Ninth Circuit has not held that "warnings are required whenever less than deadly force is employed." *Id.* Rather, the court has "simply determine[d] that such warnings should be given, when feasible, if the use of force may result in serious injury[.]" *Id*. Here, the use of force was minimal and not the type that might result in serious injury. Although less restrictive means—such as warnings—possibly could have been employed, the issue is whether McDonald's actions fell within the range of objectively reasonable behavior, which they did in this case.

Moreover, while McDonald ultimately concluded that Benton suffered from mental health issues, there is no evidence he had received any information pertaining to Benton's mental health during his 30- to 45-second conversation with the LSOs. In deciding whether an officer acted reasonably, the court "cannot consider evidence of which the officers were unaware." *Glenn*, 673 F.3d at 873 n. 8.

Resolving all factual disputes in Benton's favor, McDonald's use of force was within the range of what was objectively reasonable under the circumstances. Because no Fourth Amendment violation occurred, summary judgment must be granted.

### III. Qualified Immunity

Because the use of force was not excessive, it is not necessary to discuss the issue of qualified immunity.

### CONCLUSION

For the reasons discussed above, defendant McDonald's Motion for Summary Judgment (ECF #126) is GRANTED.

Dated this 12th day of December, 2017.

/s/ Youlee Yim You

Youlee Yim You
United States Magistrate Judge